**Helen L. ALDRICH, Plaintiff,**

v.

**THOMSON McKINNON SECURITIES INC. and George A. Serhal, Defendants.**

**No. 83 Civ. 3570 (KTD).**

United States District Court, S.D. New York.

July 5, 1984.

Milberg, Weiss, Bershad, Specthrie & Lerach, New York City, for plaintiff; Patricia M. Hynes, Elizabeth A. Shollenberger, New York City, of counsel.

Wilson, Elser, Edelman & Dicker, New York City, for defendants; Edward J. Boyle, James M. Kaplan, New York City, of counsel.

## MEMORANDUM AND ORDER

KEVIN THOMAS DUFFY, District Judge.

After a trial that I held in this securities' fraud action from May 7, 1984 to May 22, 1984, a jury returned a verdict against the defendants for over $3 million in punitive damages and $175,000 in compensatory damages. Defendants George A. Serhal and Thomson McKinnon Securities, Inc. ("Thomson McKinnon") now move for judgment notwithstanding the verdict ("JNOV") pursuant to Fed.R.Civ.P. 50(b), or alternatively, for a new trial on the issue of the amount of punitive damages, pursuant to Fed.R.Civ.P. 59(b). For the reasons that follow defendants' motion is denied.

I will not recount every or even most of the evidence introduced at trial. Plaintiff's action arose out of a series of options' trades carried out by defendant Serhal in plaintiff's securities' account at Thomson McKinnon. After defendant Serhal earned in eleven months over $143,000 in commissions trading in her $300,000 account, while

plaintiff suffered a total loss of her investment, she brought this action asserting securities' fraud, eventually prevailing after a two week jury trial. Defendants now move for a JNOV or new trial only on the jury's punitive damage award of $3 million and $12,500 against Thomson McKinnon and Serhal, respectively. The essence of their argument is that the evidence adduced at trial did not demonstrate a fraud perpetrated on the public, and that the latter is a necessary prerequisite to an award of punitive damages. I disagree on both counts.

■ First, I do not interpret New York law as requiring that the fraud be on the public generally. *See, e.g., Borkowski v. Borkowski*, 39 N.Y.2d 982, 982, 355 N.E.2d 287, 287, 387 N.Y.S.2d 233, 233 (1976); *accord Roy Export Company Establishment v. Columbia Broadcasting Systems, Inc.*, 672 F.2d 1095, 1106 (2d Cir.) ("New York law clearly permits punitive damages where a wrong is aggravated by recklessness or willfulness ... whether or not directed against the public generally") (citations omitted), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). A "reasonable" jury, *see Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir.1970) ("reasonable jury" standard on a JNOV motion), could certainly have found that plaintiff's proof established "such gross, wanton, or willful fraud or other morally culpable conduct to a degree sufficient to justify an award of punitive damages." *Borkowski*, 355 N.E.2d at 287, 387 N.Y.S.2d at 233; *see* discussion *infra*.

■ Second, even if a fraud on the public were a necessary element of her proof, plaintiff's evidence on this issue was sufficient for a reasonable jury to have made such a finding. I note that in my instructions to the jury, I instructed them "[t]hat the concept of punitive damages is to punish the wrongdoer for flagrant conduct against the plaintiff *and against society.*" Trial Transcript at 1368 (emphasis added). Plaintiff introduced evidence at trial that a reasonable jury could believe, which would establish clearly and convincingly that de-

fendants' conduct, and Thomson McKinnon's in particular, constituted a fraud on the public.

Thomson McKinnon's insufficient supervision of George Serhal appears to have been representative of its supervision of all of its account executives. For example, even if I were to accept the testimony proffered at trial by the Thomson McKinnon employees at face value, it demonstrated: (1) that Thomson McKinnon was aware that the initial plan prepared for Ms. Aldrich contemplated a conservative investment in utility bonds; (2) that Thomson McKinnon did virtually nothing for several months while the account executive Serhal swiftly changed the composition of plaintiff's investments through high volume options' trading into a portfolio of speculative securities, creating vastly more substantial commissions in the process than he had previously earned; (3) that no effort was made by Thomson McKinnon to verify information concerning Ms. Aldrich's background or the suitability of the trades in her account; (4) that on numerous occasions Serhal, with the approval of his supervisors, violated Thomson McKinnon's own internal office guidelines for options' trading; and (5) that when Thomson McKinnon's compliance department finally began to investigate the large trading volume and excessive commissions being generated in plaintiff's account at a time when there was still equity in the account, no follow up inquiry ever was completed until after the equity had been completely dissipated. In short, defendants' employees own testimony demonstrated an unqualified failure to supervise or train adequately its account executive Serhal.

■ Moreover, a reasonable jury could certainly have found this testimony was not an accurate portrayal of the grievous lack of satisfactory supervision of Thomson McKinnon's account executive. Defendant's employees' testimony during the trial appeared to me, and could have appeared to a reasonable jury to be far from credible. On numerous occasions, the Thomson McKinnon individuals' recollection of the events surrounding the total loss of plaintiff's portfolio appeared shaded consonant with Thomson McKinnon's perception of what was necessary to defeat plaintiff's claims. Unfortunately, the cold record cannot reflect this obvious lack of credibility. For instance, I have heard of people perspiring when they were forced to lie, but one of the Thomson McKinnon managers sweated so profusely in the cool courtroom that his glasses fogged up. The jury could have reasonably concluded that this was occasioned by the reluctance of the witness to undertake an improper, unfair, and immoral course dictated by his employer.

Defendant's bad faith in continuing its reckless mishandling of plaintiff's account is further demonstrated by Thomson McKinnon's attempt to obtain a release from plaintiff of all liability on the part of Thomson McKinnon in exchange for cancellation of three unauthorized trades. Because defendants gave every indication that these actions were representative of its usual supervision of customer's accounts, a reasonable jury certainly could have found that defendants' conduct constituted a fraud upon the public.

■ Defendants' second ground for a JNOV is that before punitive damages can be assessed against a corporation its management must have either "authorized, participated in, consented to, or, after discovery, ratified the conduct giving rise to [the punitive] damages." *Koufakis v. Carvel*, 425 F.2d 892, 905 (2d Cir.1970) (citing *Roginsky v. Richardson-Merrell, Inc.*, 378 F.2d 832, 842 (2d Cir.1967)). Defendants contend that no employee sufficiently high in the management hierarchy can be said to have acted in a way that would bind Thomson McKinnon. According to defendant, neither of the vice presidents that supervised Serhal have "sufficient authority to represent Thomson in the institutional sense ...." Defendants' Memorandum of Law at 19.

The test of who is a "superior officer" or a "person in authority" to bind the corporate entity to participation or ratification cannot be rigid.... The question is

whether the act or ratification is done by a person of such responsibility as to arouse the "institutional conscience".... The test is whether the continuing tortious conduct has been brought home to the consciousness of relatively important managerial personnel with authority to make a decision for the corporation that would have prevented the damage. To hold that punitive damages may not be imposed unless there is participation in the tortfeasing decision by the highest corporate executives is unrealistic given the size of giant corporations like appellant whose operations are so far-flung.

*Doralee Estates v. Cities Service Oil Co.,* 569 F.2d 716, 722 (2d Cir.1977). Serhal's supervisors were both Thomson McKinnon Vice Presidents and Branch Managers. As such, these individuals were obviously "managerial personnel with authority to make a decision for the corporation that would have prevented the damage." *Id.* Accordingly, this aspect of defendants' motion must also be rejected.

■ Defendants' next claim is that the punitive damage award must be set aside and a new trial granted because the verdict was the product of passion or prejudice. This argument is frivolous. Defendants cite three examples of assertedly prejudicial conduct by plaintiff's counsel. Turning to the first two, I note that with respect to plaintiff's counsel's questions concerning the SEC's censure of Thomson McKinnon as well as her argument that the plaintiff should be awarded psychiatric and emotional damages, objections were made, sustained, and curative instructions to the jury were issued. Moreover, neither of these instances could have resulted in more than *de minimis* prejudicial effect. The third instance of allegedly prejudicial conduct concerns plaintiff's counsel's summation. Although plaintiff's counsel's summation was articulate and eloquent it was not prejudicial. In addition, I note that defendants did not raise any objection either during or after her summation, thereby waiving this claim now.

■ Defendants also assert that before Thomson McKinnon's net worth should have been disclosed the jury should first have been asked whether an award of punitive damages would be made. Defendants never made this request at trial. As the Second Circuit has stated in a related context:

> The *Rupert* [*v. Sellers,* 48 A.D.2d 265, 368 N.Y.S.2d 904 (1975)] court therefore prudently adopted the New Jersey rule that, as a "procedural principle," evidence of a defendant's wealth cannot be brought out at trial unless and until the jury has brought in a special verdict that the plaintiff is entitled to punitive damages.... But Brink's never suggested to the trial court that the *Rupert* practice should be followed; its argument on appeal therefore amounts to a claim that the trial court should have *sua sponte* ordered a bifurcated trial. Brink's had ample notice from the time the City filed its counterclaim that punitive damages were sought, but bifurcation was never requested.

*Brink's Inc. v. City of New York,* 717 F.2d 700, 707 (2d Cir.1983). Therefore, defendants' argument must be rejected.

■ Defendants' final argument is that the punitive damage award was excessive. Part of their argument rests on the fact that the jury only awarded $175,000 against the two defendants. I find this last fact, however, merely demonstrates that the jury may have failed to award the plaintiff compensatory damages commensurate with the loss suffered. Furthermore, the $3 million verdict was entirely appropriate given defendants' flagrant and egregious failure to protect the investing public in general, and this plaintiff in particular.

Defendants' motion is denied.

SO ORDERED.