[643 NYS2d 33]

Davɪᴅ M. Swᴇʀsᴋʏ et al., Appellants-Respondents, v Dʀᴇʏᴇʀ ᴀɴᴅ Tʀᴀᴜʙ et al., Respondents-Appellants.

First Department, April 30, 1996

### APPEARANCES OF COUNSEL

*Stephen M. Charme* of counsel *(Alan S. Liebman* and *Gregg H. Kanter* on the brief; *Holtzmann, Wise & Shepard,* attorneys), for appellants-respondents.

*Anthony P. Colavita* of counsel *(Noah Nunberg, Barbara J. Romaine* and *Peter E. Zinman* on the brief; *Dreyer & Traub, L. L. P.,* and *L'Abbate, Balkan, Colavita & Contini, L. L. P.,* attorneys), for Dreyer and Traub, respondent-appellant.

*Douglas H. Flaum* of counsel *(Allen Kezsbom* and *Rachel S. Fleishman* on the brief; *Fried, Frank, Harris, Shriver & Jacobson,* attorneys), for Howard Morse, respondent-appellant.

### OPINION OF THE COURT

ROSENBERGER, J. P.

This action concerns plaintiffs' purchase on March 9, 1987 of 460,000 shares of the unregistered common stock of QMAX Technology Group, Inc. (QMAX) for $1,150,000. Defendant Howard Morse is the attorney who helped negotiate the sale on behalf of QMAX, and Dreyer and Traub is the law firm of which he is a partner. The appeal arises from defendants' motion to dismiss the complaint under CPLR 3211. The court dismissed plaintiffs' first four causes of action, dismissed

plaintiffs' request for punitive damages, limited damages to actual pecuniary loss, with no recovery for lost profits, and denied both the defendants' motion and the plaintiffs' cross motion for sanctions.

We must accept the facts, as alleged in the complaint, as true, according plaintiffs the benefit of every favorable inference, and then determine whether "the facts as alleged fit within any cognizable legal theory" (*Gabriel v Therapists Unlimited*, 218 AD2d 614, 615). Because plaintiffs' version of the events preceding the execution of the stock purchase agreement, and the subsequent letter agreement to extend the filing deadline, set forth a prima facie claim of fraud under both theories alleged in the complaint, the order appealed should be modified to reinstate the first four causes of action. Plaintiffs' claims for punitive damages against both defendants should also be reinstated.

The complaint alleges that in December 1986, Winfried Schuberth, the Chief Executive Officer of QMAX, approached David M. Swersky and asked whether Swersky knew of anyone who would invest one million dollars in the company. Swersky, an attorney, who had formerly served as counsel to QMAX, indicated that he might be interested in making this investment. Schuberth asked Swersky to negotiate the specific terms with Howard Morse, the partner at Dreyer and Traub who handled the QMAX account.

Swersky thereafter negotiated the terms of his own investment in QMAX. He also negotiated investments on behalf of the other plaintiffs. He apparently informed Morse of his desire that any QMAX stock which he would purchase be filed immediately under an S-3 registration statement so that it could be immediately sold. Swersky intended to borrow money to finance his purchase, and he needed to register his shares quickly because their saleability would allow him to raise the money to repay his loan. In the month of December 1986, Morse first told Swersky that his shares could be registered immediately, then told him that the shares could not be registered under an S-3 statement until November 1987[1].

To avoid this delay, Swersky asked Schuberth if he could become a QMAX officer, to become eligible to acquire that stock pursuant to the company's Employee Stock Option Plan

1.  Apparently an S-3 form for registering stock cannot be filed until three years after a company becomes publicly owned, which occurred here in November 1984.

(ESOP). Stock acquired under an ESOP by corporate officers, directors and employees could be immediately registered under an S-8 registration statement. Schuberth told Swersky that this plan was acceptable to him, and advised Swersky to work out the details with Morse.

In early December 1986, Morse informed Swersky that all the stock Swersky intended to purchase could be acquired and registered immediately pursuant to the ESOP. Then, in January 1987, Morse advised Swersky that no ESOP shares were available, and that any stock he would purchase could not be registered under an S-8 statement. On December 30, 1986, unbeknownst to Swersky and the other plaintiffs, QMAX granted Morse an option for 100,000 ESOP shares. In February 1987, Dreyer and Traub prepared an S-8 registration statement for QMAX, which Morse signed, and was filed with the Securities and Exchange Commission (SEC), which did not list the 100,000 option shares which Morse had been granted. Morse did not file a Form 3 or Form 4 with the SEC to indicate that he had acquired this option.[2]

In reliance upon Morse's misrepresentations, on March 9, 1987, plaintiffs signed a stock purchase agreement, pursuant to which they purchased the 460,000 restricted shares of QMAX common stock for $2.50 per share, for a total price of $1,150,000. The stock purchase agreement required QMAX to file an S-3 registration statement on November 10, 1987, unless Swersky advised the company otherwise in writing. During the eight-month period that plaintiffs were required to wait for registration of their shares, Morse sold a portion of the shares he had personally acquired and immediately registered, making a profit of at least $340,000.

On October 15, 1987, Swersky wrote to Morse, and instructed him to file the S-3 registration statement. In response to this request, Morse urged Swersky to permit a delay in the stock's registration, claiming that immediate registration would make too much QMAX stock available on the market, depressing its price. Morse told Swersky that since the price had already dropped from the mid-teens to single digits in the aftermath of October 1987's "Black Monday", any further decline would

2. 17 CFR 240.16a-2 requires that directors and policy-making officers of an issuing company file a Form 3 or Form 4 to indicate the acquisition of an option. The parties disagree as to whether Morse, as Assistant Secretary and Counsel to QMAX, falls within this class. For purposes of evaluating the complaint against a CPLR 3211 motion to dismiss, we accept plaintiffs' position that Morse was a policy-making officer of QMAX.

make it difficult for the company to attract investors. Morse urged Swersky to be a "team player" for the good of the company, and to wait a few months before registering his shares.

Swersky opposed the extension, and at a meeting held at the Dreyer and Traub offices in December 1987, he reminded Morse that he had borrowed money from a bank in order to purchase his shares, and that his ability to repay this debt was contingent upon transferring his QMAX stock. Morse continued to urge Swersky to be a "team player", and he represented to Swersky that none of QMAX's officers or other insiders had sold their shares prior to "Black Monday", that none had made money, and that all the investors were therefore in the same position.

Relying upon these representations, Swersky agreed by letter agreement executed December 22, 1987 to extend QMAX's deadline for registering the shares to March 31, 1988. This letter indicated to plaintiffs, for the first time, that Morse was Assistant Secretary of the company. Plaintiffs admittedly did not yet know that he was also a shareholder.

Morse did not tell Swersky at the time the letter agreement was entered into, in August 1987, that QMAX had rejected an offer which would have provided that company with $15 million in financing. Morse allegedly withheld this information because he had urged the rejection of the financing offer in hopes that he could obtain similar financing from one of his former law clients. This financing, if successful, would have allowed him personally to obtain additional stock options and other benefits. Morse also withheld from Swersky information that QMAX's relationships with some major customers were rapidly deteriorating.

QMAX missed the March 31, 1988 extended filing date for registering plaintiffs' shares, while Morse represented to Swersky that he was working as expeditiously as possible to complete the necessary legal work. Around April 13, 1988, Morse filed an incomplete registration statement, which, plaintiffs allege, he knew would be rejected, for the sole purpose of misleading Swersky to believe that he was making an effort to comply with his obligations, while instead intentionally delaying the registration process until his former client's financing of QMAX could be arranged.

Morse also apparently interfered with the registration process via telephone calls to the SEC and failed to file a Form 10-k for the company, in order to facilitate the above-mentioned financing scheme. Plaintiffs' shares were never registered

because the SEC began an investigation regarding alleged insider trading at QMAX. QMAX filed for bankruptcy in July 1989. Plaintiffs' shares became worthless. Their investment was lost.

The complaint alleges six claims of common-law fraud. The first and second concern the events preceding the execution of the stock purchase agreement, specifically, Morse's affirmative misrepresentation that there were no ESOP shares available (first cause of action), and his concealment of the fact that he had been granted an option for 100,000 ESOP shares which were immediately registered (second cause of action). The third and fourth causes of action allege that during the period between the execution of the stock purchase agreement and the extended March 31, 1988 deadline for registering the shares, Morse fraudulently induced plaintiffs to agree to extending the time for filing the S-3 registration statement. This was allegedly done by making misleading statements, concealing his own substantial profits, concealing his desire that the company obtain further financing from his former client, and concealing the true nature of QMAX's deteriorating business relationships with certain of its customers. Plaintiffs' fifth and sixth causes of action seek damages for Morse's postdeadline fraudulent assurances that the S-3 registration would be filed.

The first, third, and fifth claims allege fraudulent misrepresentation, the elements of which are: (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiffs thereby, (3) the plaintiffs reasonably relied upon the representation, and (4) the plaintiffs suffered damage as a result of their reliance (see, Banque Arabe et Internationale D'Investissement v Maryland Natl. Bank, 57 F3d 146, 153 [2d Cir applying New York law]). The second, fourth, and sixth causes of action allege fraudulent concealment, which requires additionally setting forth that the defendant had a duty to disclose material information (Banque Arabe et Internationale D'Investissement v Maryland Natl. Bank, supra, at 153; see also, Brass v American Film Technologies, 987 F2d 142, 152 [2d Cir]). For both theories of fraud, the more stringent CPLR 3016 (b) pleading rule requires that "the circumstances constituting the wrong shall be stated in detail" (see, Ambassador Factors v Kandel & Co., 215 AD2d 305).

While finding that all of the other elements of fraud had been met, the trial court dismissed the first cause of action on the ground that reliance upon Morse's misstatements was unjustified. The court applied the principle that "[i]f the facts

represented are not matters peculiarly within the party's knowledge, and the other party has the means available to him of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations (*Danann Realty Corp. v Harris*, 5 NY2d 317, 322)", to conclude that based upon Swersky's sophistication, his former relationship as counsel to QMAX, his access to Schuberth, and the availability of the 10-k filed by QMAX in June 1986, he had the means to divine that ESOP shares were available in December of 1986.

This issue should not have been resolved as a matter of law. The record reveals that Swersky had access to the 10-k filed by QMAX in June of 1986, and the S-8 filed by the company in February 1987. However, although the June 1986 10-k indicated that Morse had been granted an option, it did not provide any information about the availability of ESOP shares in December of 1986. In addition, the 100,000-share option which Morse had been granted was not listed on the February 1987 S-8 registration statement.

The value of Swersky's access to Schuberth is also questionable. It is unclear from the present record how much information regarding the specifics of the availability of ESOP shares Schuberth had, and, given the alignment of economic interests, how candid he would have been with any information he did have. Since these are issues which require resolution by the trier of fact, summary dismissal of the first cause was improper (*see, Century 21 v Woolworth Co.*, 181 AD2d 620; *Black v Chittenden*, 69 NY2d 665, 669).

The second cause of action should similarly have been sustained. Although the arm's length nature of this transaction negates any alleged duty to disclose based upon a fiduciary relationship (*see, e.g., Republic of Croatia v Trustee of Marquess of Northampton 1987 Settlement*, 203 AD2d 167, 168, *lv denied* 84 NY2d 805), there is still an outstanding issue as to whether Morse had a duty to disclose his December 1986 stock option purchase as a matter peculiarly within his knowledge. Under the "special facts" doctrine, a duty to disclose arises " 'where one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair' " (*Beneficial Commercial Corp. v Glick Datsun*, 601 F Supp 770, 773 [SD NY], quoting *Chiarella v United States*, 445 US 222, 248; *Ferer & Sons v Chase Manhattan Bank*, 731 F2d 112, 123

[2d Cir]). Because there are outstanding issues as to whether the disparity in the level of information available to Morse, but not to Swersky, places this case within the ambit of the "special facts" doctrine, and, as discussed with respect to the first cause of action, whether plaintiffs could have through "the exercise of ordinary intelligence" independently ascertained that Morse had acquired his December 1986 option, the second cause of action should be reinstated (*Century 21 v Woolworth Co., supra,* at 625; *Black v Chittenden, supra,* at 669).

There are also outstanding factual issues pertaining to the third and fourth causes of action. The trier of fact must determine the reasonableness of Swersky's reliance upon Morse's representations that none of QMAX's officers or insiders had sold their stock during the summer and fall of 1987, as well as whether Morse's concealment of his own financial transactions and interests was material to Swersky's decision to execute the letter agreement (*Allen v Westpoint-Pepperell, Inc.,* 945 F2d 40, 45 ["A fact may not be dismissed as immaterial unless it is 'so obviously unimportant * * * that reasonable minds could not differ on the question of (its) importance' (citations omitted)]"). The trial court should not have resolved these issues as a matter of law.

■ Plaintiffs' claims for punitive damages were also improperly dismissed. Punitive damages are available in a tort action where the wrongdoing is intentional or deliberate, has circumstances of aggravation or outrage, has a fraudulent or evil motive, or is in such conscious disregard of the rights of another that it is deemed willful and wanton (*see, Prozeralik v Capital Cities Communications,* 82 NY2d 466, 479, citing Prosser and Keeton, Torts § 2, at 9-10 [5th ed]). It is for the jury to decide whether Morse's direct dealings with Swersky were so reprehensible as to warrant punitive damages (*Loughry v Lincoln First Bank,* 67 NY2d 369, 378; *AT&T Information Sys. v McLean Bus. Servs.,* 175 AD2d 652, 653; *see also, Nardelli v Stamberg,* 44 NY2d 500, 503 ["(w)hether to award punitive damages in a particular case, as well as the amount of such damages, if any, are primarily questions which reside in the sound discretion of the original trier of the facts (citations omitted)"]). That the harm alleged might not have been aimed at the general public does not alter this result (*Giblin v Murphy,* 73 NY2d 769, 772).

Analogizing this law firm partnership to a corporate employer, against whom New York courts have allowed awards of punitive damages, "where management has authorized,

participated in, consented to or ratified the conduct giving rise to such damages, or deliberately retained the unfit servant [citations omitted], or the wrong was in pursuance of a recognized business system of the entity [citation omitted]" (*Loughry v Lincoln First Bank*, 67 NY2d 369, 378, *supra*), we would also sustain the claim for punitive damages against Dreyer and Traub. Although the partnership may not have explicitly ratified Morse's activities on behalf of their client QMAX, the trial court properly found that because the alleged misconduct was conducted within the scope of the partnership's business, the firm may be held liable to the same extent as the individual defendant (Partnership Law § 24; *see also, Barnhard v Barnhard*, 179 AD2d 715; *Clients' Sec. Fund v Grandeau*, 72 NY2d 62, 67). An award of punitive damages is appropriate based upon a jury's determination that such an award would advance the goal of deterring wrongful conduct by motivating an employer, or, here, a partnership, adequately to supervise its employees, particularly those whose actions may reflect what has become known as the "corporate culture" and implicate the " 'institutional conscience' " (*Aldrich v Thomson McKinnon Sec.*, 589 F Supp 683, 686, *vacated on other grounds* 756 F2d 243), and to take preventative measures (*Loughry v Lincoln First Bank*, 67 NY2d 369, 377, *supra*).

Accordingly, the order of the Supreme Court, New York County (Herman Cahn, J.), entered on or about February 6, 1995, should be modified, on the law, to reinstate the first four causes of action and the demand for punitive damages against both the individual and partnership defendants, and otherwise affirmed, without costs.

NARDELLI and MAZZARELLI, JJ., concur with ROSENBERGER, J. P.; RUBIN and KUPFERMAN, JJ., dissent and would affirm for the reasons stated by CAHN, J.

Order, Supreme Court, New York County, entered on or about February 6, 1995, modified, on the law, to reinstate the first, second, third and fourth causes of action and the demand for punitive damages against both the individual and partnership defendants, and otherwise affirmed, without costs.