[691 NYS2d 439]

BANK OF INDIA, Appellant-Respondent, v WEG AND MYERS, P. C., Respondent-Appellant.

First Department, June 8, 1999

### APPEARANCES OF COUNSEL

*Allen Green* of counsel, New York City (*Kalnick Klee & Green, L. L. P.,* attorneys), for appellant-respondent.

*Stuart J. Miller* of counsel, New York City (*John C. Lankenau* on the brief; *John C. Lankenau & Associates,* attorneys), for respondent-appellant.

### OPINION OF THE COURT

TOM, J.

This is an action by a lending institution to recover insurance proceeds, covering the loss of the secured property, from the debtor's law firm, which, in custody of the insurance check, and under protest by the lender, released the funds, not to the lender, but to the defaulting debtor, after the law firm also deducted its legal fees therefrom.

In 1984, plaintiff Bank of India advanced funds to Pali Fashions, Inc. Pali's principals were Satinder Pal Anand and his wife Sabita Anand, each 50% shareholders, each an officer and each, according to a 1983 Certification of Officers, "empowered to act for and on behalf of this Corporation [Pali] in any of its business with the said Bank". The corporate office was listed as 30 West 36th Street in Manhattan, which also served as its warehouse.

Among the documents executed in connection with the credit advances was a General Security Agreement, ensuring the Bank a security interest in all of Pali's assets. Specifically, the Agreement provides the Bank with a security interest in "all of the personal property of the undersigned, now or hereafter acquired and wherever located," inclusive of an illustrative list of properties, "and the proceeds and products of each of the

foregoing in any form whatsoever". The Agreement elsewhere provided that the debtor covenanted "that, if you [i.e., the Bank] so demand in writing at any time, all proceeds shall be delivered to you promptly upon their receipt in a form satisfactory to you". The debtor further covenanted "to execute and deliver, upon request, any * * * instrument, document * * * or other papers and/or to perform any act requested by you which may be necessary to create, perfect, preserve, validate or otherwise protect any security interest granted pursuant hereto or to enable you to exercise and enforce your rights hereunder or with respect to such security interest". The Agreement was signed by Satinder Anand. Although the capacity in which Anand signed was not specified, the debtor's corporate address was identified as 30 West 36th Street. Evidence was adduced that during this time period, the Anands resided in Queens. Notably, the debtor is characterized throughout the agreement as "it" rather than "he" or "she," suggesting that "the undersigned," Anand, signed as representative of the debtor. In any event, that conclusion is borne out by the UCC-1 filings, which were commenced in 1984 and renewed through 1994. The UCC-1s further identified Pali Fashions, Inc., at 30 West 36th Street, as the debtor. The 1984 UCC-1 by its terms was filed to perfect "a security interest in collateral * * * under a security agreement signed by debtor," i.e., Pali. The UCC-1 covered "[a]ll assets of the company including but not limited to" another list of generic properties, and "the proceeds thereof." Both Anands also personally guaranteed the debt. The guarantee document, signed by the individual Anands in their personal capacity, identifying themselves under the same Queens address, identified the debtor as Pali Fashions, Inc. By letter dated November 29, 1984, Satinder Anand informed the Bank that the personal guarantees were additional collateral, but that all of Pali's assets secured the debt.

 In 1985, the secured collateral in the warehouse sustained water damage. Apparently, Pali had difficulty from the beginning in securing payment of an insurance policy covering the loss. Pali retained defendant Weg & Myers to represent it in New York County litigation regarding the insurance claim. The Bank was informed of the loss and the claim, which Pali anticipated would be $350,000. Subsequently, numerous communications among these parties occurred, addressing arrears, the insurance claim, and payment of the proceeds to the Bank. Our review of these documents, individually and in toto, compels our conclusion that there is no reasonable ambiguity

concerning the capacity in which the Anands acted, or of their understanding that the insurance proceeds, if recovered, also served as collateral for the debt. Moreover, the record also clearly evidences Weg & Myers' timely recognition of such, which is fatal to much of their defense.

By letter dated April 15, 1986, Sabita Anand, then President of Pali, notified the Bank that Pali expected to receive the insurance proceeds soon and, upon receipt, "will send you the check immediately." By letter dated June 16, 1986, the insurance adjuster wrote to the Bank to advise it of the status of the insurance claim. In March 1987, the insurance litigation was commenced, and a copy of the summons was sent to the Bank. By letter dated August 19, 1987, Sabita Anand informed the Bank that a speedy resolution of the claim would allow Pali to satisfy arrears to the Bank. Again on November 2, 1987, Pali was optimistic that the claim would be resolved within a few months, and so informed the Bank. The Bank wrote to Pali Fashions, Inc., addressed to "Dear Sirs," at 30 West 36th Street, indicated the outstanding indebtedness and arrears, inquiring into the status of the insurance litigation, and requesting that arrangements be made for payment. At this time, Pali's outstanding indebtedness to the Bank was $231,004.07.

By letter dated June 3, 1988, Dennis D'Antonio, Esq., of Weg & Myers, wrote to the Bank indicating, again, that the firm was retained to handle the insurance claim, that it believed that its client would prevail, and also trumpeting that the firm was "nationally known and enjoys the highest rating". By this point, the Bank had clearly represented itself as an interested party as regards the proceeds and the law firm's recognition of that interest cannot reasonably be gainsaid. By letter dated December 20, 1988, the Bank wrote to Satinder Anand, as representative of Pali, memorializing conversations the prior week in which Anand promised to have its attorneys submit a status report on the insurance claim, which promise was as yet unfulfilled, and requesting speedy compliance. Weg & Myers' December 23, 1988 response, noting that counsel was acting at the behest of Anand, as principal of Pali, advised the Bank that an appeal had been taken, which might delay a "swift and equitable resolution" by several months.

On August 16, 1989, Satinder Anand, on Pali letterhead, indicating its recent repayment of some $238,000 and that the business was in a growth state, requested further financing, especially since it had not received any insurance proceeds.

The Bank requested another status report from Pali on January 19, 1990, and Pali responded by forwarding a copy of a letter from Weg & Myers shortly thereafter. Pali acknowledged its outstanding debt of $759,000 in December 1991, and again in April 1993, with letters in between suggesting payment options. Sabita Anand, represented by Weg & Myers, was finally deposed in the insurance litigation on November 6, 1992, at which she acknowledged the debt to the Bank as of the date of the loss, that "the entire loss was collateral with the bank" and that Pali owed the entire amount of the insured loss to the Bank. By letter dated June 13, 1994 to Weg & Myers, the Bank's attorneys emphasized that the Bank asserted claims under the Agreement to all proceeds arising from the insurance litigation, whether obtained by settlement, judgment or otherwise. The demand was repeated in an August 2, 1994 letter, confirming that this arrangement, and Weg & Myers' awareness of it, was dated at least to 1986.

By 1994, Pali was in default. The Bank commenced an action against Pali as debtor and against both Anands as guarantors, resulting in a money judgment entered September 26, 1996 for the Bank in the amount of $1,023,321.64. During the course of that litigation, the Bank communicated with Weg & Myers seeking to ascertain the status of the insurance claim, and advising the law firm of its perfected security interest in all of Pali's assets, including the insurance proceeds covering the loss of Pali's assets. These communications included telephone conversations and letters. The Bank delivered to Weg & Myers a copy of the General Security Agreement, copies of correspondence, copies of UCC-1s establishing its perfected security interest, and copies of correspondence among the Bank, the Anands and Weg & Myers dating from the mid-1980s establishing Pali's promise, by the Anands, that the proceeds would be given to the Bank. The Bank consistently repeated the demand that the proceeds be remitted to the Bank as part of the collateral for the debt.

At some point in 1994, Weg & Myers stopped returning calls to the bank. The chronology thereafter is telling. The insurance claim was settled for $90,000 on or about August 3, 1994. A check for this amount dated August 27, 1994, payable jointly to Pali and to Weg & Myers, was delivered to Weg & Myers. Then, for the first time, in an August 29, 1994 letter, Weg & Myers took the position that the Bank was not entitled to the proceeds, contending that Pali had not signed the UCC-1s, or the Agreement, and that the Bank was not identified as a loss

payee on the insurance policy, nor had it secured a lien against those proceeds. That letter notably failed to inform the bank of the settlement or the law firm's possession of the check. On August 30, 1994, though, the Bank countered that any disbursement of the insurance proceeds would violate the Bank's lien on Pali's assets, for which it would seek to hold Weg & Myers liable for treble damages under the Judiciary Law, and that the law firm's challenge to the Bank's right to the proceeds was untimely by several years and contrary to the law firm's and its clients' prior acknowledgments of the Bank's interest in the proceeds, as evidenced by copies of letters sent by the Bank to Weg & Myers. During this time period, an additional settlement check for $20,000 was received by Weg & Myers. By letter dated September 1, 1994, Weg & Myers took the position that since the entitlement to the proceeds as between the Bank and Pali was being litigated—necessarily establishing the law firm's knowledge of the Bank's claim on the proceeds—the law firm would not deliver the proceeds— now $110,000—to the Bank until the Bank's rights had been adjudicated. As noted, that judgment, identifying 30 West 36th Street as Pali's place of business, was entered shortly thereafter. But, rather than delivering the proceeds to the Bank, Weg & Myers paid itself its legal fees out of the proceeds and paid the balance to Pali.

That conduct led to the present litigation whereby the Bank seeks to recover, from the law firm itself, the proceeds of the insurance policy, and a correlating amount in damages resulting from impairment of the Bank's security interest in those proceeds. The Bank also claims that Weg & Myers damaged it in the amount of $110,000 by violating its equitable lien in those proceeds, by inducing Pali to breach its security agreement with the Bank, by intentionally interfering with that agreement, and by the law firm's fraud and misrepresentation. The Bank also seeks $500,000 in punitive damages in connection with the tortious interference claim and treble damages of $330,000 for violation of Judiciary Law § 487.

The law firm, aside from general denials that are basically undermined by the record, relied on defenses that as Pali's attorney, it owed no duty to the Bank, that it could not remit the proceeds to the Bank in the face of Pali's instructions to the contrary, that the Bank failed to perfect a lien on the settlement proceeds, and that, in any event, whatever the merit of the Bank's right to the proceeds as against Pali, that right was subject to Weg & Myers' charging lien of $31,231.36. Each

party sought summary judgment, occasioning additional allegations, claims and putative defenses. The motion court dismissed the Judiciary Law claim on the basis that the law firm had not been a party to the judicial proceeding at the time of its alleged deception, granted Weg & Myers' request to amend its answer, and, finding material issues of fact regarding the role of the Anands in relation to Pali, denied the Bank summary judgment.

Initially, a security agreement is deemed signed by the debtor when signed by the debtor's representative (Uniform Commercial Code § 1-201 [39]; *In re Kam Kuo Seafood Corp.*, 76 Bankr 297, 301, *affd* 1990 US Dist LEXIS 2584 [SD NY, Mar. 9, 1990, Cannella, J.]). The Agreement in this case was signed by Satinder Anand, who was recognized by all parties as Pali's corporate officer and representative. His signature was over an address identified as Pali's. Hence, Satinder Anand, as an officer of the indebted corporation, gave the Bank an interest in the collateral of Pali as the indebted corporation. The UCC-1s and the ample correspondence between the Pali representatives and the Bank underscores this basic, uncontrovertible, fact. Moreover, Weg & Myers has never submitted admissible evidence that Satinder Anand signed only in a personal, rather than corporate, capacity, to somehow vitiate the Bank's interest in Pali's, rather than only Anand's, property and proceeds thereof.

The Agreement, by its terms, gave the Bank a security interest in all of Pali's property and assets, as well as in "proceeds" thereof. New York's Uniform Commercial Code, in defining "proceeds," states that "[i]nsurance payable by reason of loss or damage to the collateral is proceeds, except to the extent that it is payable to a person other than a party to the security agreement" (UCC 9-306 [1]). Pali, acting through the Anands, was the party to the security agreement, so that the exception set forth in UCC 9-306 (1) is not invoked. The UCC thus "protects the rights of a secured creditor by according it an interest in property that the debtor receives as replacement for the encumbered property" (*Badillo v Tower Ins. Co.*, 92 NY2d 790, 794), such as an insurance recovery.

The statute also states that "a security interest continues in collateral notwithstanding * * * [the] disposition thereof unless the disposition was authorized by the secured party in the security agreement * * * and also continues in any identifiable proceeds" (UCC 9-306 [2]). The phrasing of the Agreement, then, again correlates with the statute. It is incontrovertible

that the Bank, as the secured party, consistently asserted its rights to the insurance proceeds resulting from the damaged collateral, and never authorized any disposition except for payment of those proceeds to the Bank in partial satisfaction of the outstanding debt.

The record amply documents the law firm's notice of all these facts, as well as the Bank's claim on the proceeds, well before the insurance litigation was concluded. Far from disputing the Bank's assertion of rights in the proceeds, Weg & Myers seemingly acquiesced, and did not dispute such until after settlement was reached in the insurance litigation and the proceeds, payable to Weg & Myers and Pali, came into its own possession. The law firm's protests thereafter, purportedly on behalf of its client, are disingenuous, contradictory, and quite at odds with the law firm's stance at all times previous. In any event, Weg & Myers cannot seriously claim any lack of notice in the face of the Bank's consistent assertion of rights in the insurance proceeds, an assertion of right consistently confirmed since the time of the loss by the debtor. Hence, in addition to the constructive notice provided by the UCC-1s, the law firm had actual notice at the time that it had taken custody of the collateral (*compare, Badillo v Tower Ins. Co., supra, with Rosario-Paolo, Inc. v C & M Pizza Rest.*, 84 NY2d 379 [insurer had actual notice of creditor's equitable lien in proceeds]).

The secured party's right to possession of the collateral upon default may be asserted against a third party in possession, which may not properly refuse upon the secured party's request for delivery (*Long Is. Trust Co. v Porta Aluminum*, 49 AD2d 579). At the very least, in this case, Weg & Myers should have sought judicial direction before disposing of the disputed proceeds, especially so since it retained a portion of those proceeds for its own use. We have noted that to establish a conversion claim, "[i]t need only be shown that a plaintiff had * * * an immediate superior right of possession to the identifiable fund and the exercise by defendants of unauthorized dominion over the money in question to the exclusion of plaintiff's rights" (*Bankers Trust Co. v Cerrato, Sweeney, Cohn, Stahl & Vaccaro*, 187 AD2d 384, 385). As such, Weg & Myers converted the proceeds in its possession to its own benefit and that of its client by knowingly exercising unauthorized dominion and control (*TMMB Funding Corp. v Associated Food Stores*, 136 AD2d 540) over property in which the Bank, as a secured creditor, had a superior property interest (*Pioneer Commercial Funding Corp. v United Airlines*, 122 Bankr 871;

*Badillo v Tower Ins. Co., supra*). The fact that defendant had arranged for the insurance check to identify Weg & Myers as a payee does not change this result. Nor does it change the result that Weg & Myers was not an insurance carrier (*see, e.g., Badillo v Tower Ins. Co., supra; Rosario-Paolo, Inc. v C & M Pizza Rest., supra*), for which more formal interpleader obligations otherwise apply (*see, e.g.*, 4 Russ and Segalla, Couch on Insurance 3d, §§ 61:11, 61:22, 61:23). Once Weg & Myers had notice of an outstanding right of possession to the proceeds by a secured creditor, it became a stakeholder as to those proceeds, notwithstanding its additional role as attorney for the debtor (*see, e.g., Bankers Trust Co. v Cerrato, Sweeney, Cohn, Stahl & Vaccaro, supra*). To hold otherwise would invite unscrupulous debtors to simply arrange for contested property to be placed in counsel's custody as a means of insulating it from being claimed by the party with a superior right of possession. Our conclusion here is buttressed by this law firm's own conduct of ensuring that its own, subordinate, interest would be satisfied, by making itself a payee on the check, in direct contravention of the entire purpose of securing collateral. Here, as a matter of law, Weg & Myers' conduct was the direct cause of the Bank's damages (*compare, Bankers Trust Co. v Cerrato, Sweeney, Cohn, Stahl & Vaccaro, supra* [factual issue unresolved by the record; remanded for trial]). In view of the foregoing, we modify to grant partial summary judgment to the Bank on the conversion claim set forth in the first cause of action.

█ Similar reasoning, on the established record, also warrants summary judgment to the Bank on the claims that Weg & Myers impaired the Bank's security interest (*Pioneer Commercial Funding Corp. v United Airlines, supra*) under the second cause of action, and violated the Bank's equitable lien (*Rosario-Paolo, Inc. v C & M Pizza Rest.*, 84 NY2d 379, *supra*) set forth in the third cause of action. When "it is clear from a contract that the purpose and intent of the parties was to give a lien * * * upon specific property, equity will give to the transaction the result that it was intended to produce * * * and treats as done that which the parties intended to be done" (55 NY Jur 2d, Equity, § 102). An equitable lien is "a right * * * to have a fund, specific property, or its proceeds, applied in whole or in part to the payment of a particular debt" (75 NY Jur 2d, Liens, § 13). A subsequent holder of the property takes it subject to the rights of the equitable lienor (*Matter of Anjopa Paper & Bd. Mfg. Co.*, 269 F Supp 241, 259), including the

right of restitution to the extent of the lien (*Matter of Anjopa Paper & Bd. Mfg. Co., supra,* at 260, n 22). The validity of the equitable lien in this case did not depend on Pali's possession of the check or proceeds, since an equitable lien is imposed against the property itself (75 NY Jur 2d, Liens, § 13). Nor would it be defeated on the theory that the lien was being imposed on property acquired after the agreement giving rise to the lien (*id.,* § 4). Equitable liens may be created, as here, when the promisor agrees to hold property as security for a debt to the creditor (*id.,* §§ 15, 18). Although an equitable lien in insurance proceeds, as distinct from the insured property, may arise by a promise to obtain insurance on the property and to pay the lienor in the event of loss (*see, e.g., Rosario-Paolo, Inc. v C & M Pizza Rest., supra; compare, McGraw-Edison Credit Corp. v Allstate Ins. Co.,* 62 AD2d 872 [third party's procurement of its own insurance on secured property does not create lien as to those insurance proceeds]), the lien in the present case arises by virtue of the debtor's express covenant in the Agreement to secure all proceeds of its assets as collateral for the debt—hence also extending the lien in the collateral to all proceeds.

Since defendant here had notice of the Bank's equitable claim but disbursed the proceeds notwithstanding the Bank's interest, the Bank can recover from defendant to the extent of its lien (*Rosario-Paolo, Inc. v C & M Pizza Rest., supra*).

■ However, in view of unresolved factual issues regarding the law firm's intent to defraud the Bank (*Bankers Trust Co. v Cerrato, Sweeney, Cohn, Stahl & Vaccaro, supra*) and its motive and wantonness as grounds for punitive damages (*Swersky v Dreyer & Traub,* 219 AD2d 321, 328, *appeal withdrawn* 89 NY2d 983), summary judgment was properly denied as to those claims. Moreover, since Weg & Myers was not shown to have practiced deceit or collusion with Pali during a judicial proceeding to which Weg & Myers was a party (*Bankers Trust Co. v Cerrato, Sweeney, Cohn, Stahl & Vaccaro, supra*), the Judiciary Law claim set forth in the sixth cause of action was properly dismissed. We also leave undisturbed the motion court's grant of leave for Weg & Myers to file an amended answer to assert defenses of laches and failure to mitigate (*Sun Ann Supply v Trenz, Inc.,* 178 AD2d 328) as to the remaining claims and its denial of summary judgment to the Bank thereon.

Accordingly, the order of the Supreme Court, New York County (Carol Huff, J.), entered July 9, 1998, which, *inter alia,*

denied plaintiff's motion for summary judgment on the complaint and granted defendant's cross motion for summary judgment on the sixth cause of action based on Judiciary Law § 487, should be modified, on the law, to grant plaintiff partial summary judgment on the first, second and third causes of action, the matter remanded for further proceedings, and otherwise affirmed, with costs to plaintiff.

SULLIVAN, J. P., ROSENBERGER and LERNER, JJ., concur.

Order, Supreme Court, New York County, entered July 9,1998, modified, on the law, to grant plaintiff partial summary judgment on the first, second and third causes of action, the matter remanded for further proceedings, and otherwise affirmed, with costs to plaintiff.