**Yako RUSO, Plaintiff,**

v.

**Edward A. MORRISON, Esq., Edward A. Morrison, P.C., Cathay Continental Group, Ltd., Paul Holder, Individually and as Sole Member and Managing Member of Oxford III, LLC and Oxford III, LLC, Defendants.**

**No. 08 Civ. 3724(PKC).**

United States District Court, S.D. New York.

Feb. 4, 2010.

Michael L. Macklowitz, Law Office of Michael L. Macklowitz, New York, NY, for Plaintiff.

Andrew Lee Morrison, K & L Gates LLP, New York, NY, for Defendants.

*MEMORANDUM AND ORDER*

P. KEVIN CASTEL, District Judge.

Plaintiff Yako Ruso brings claims of common law fraud, breach of contract, negligence, breach of fiduciary duty, and misappropriation of funds under New York common law. Ruso seeks recovery of $2.5 million dollars that he transferred to defendant Edward A. Morrison in May of 2003 as part of a purported investment. (Am. Compl. ¶¶ 11, 19.) Morrison is an attorney but the parties dispute whether he ever acted as such for Ruso.

Ruso filed this action on April 18, 2008 against Morrison, Cathay Continental Group, Ltd. ("Cathay"), Paul Holder, and Oxford III, LLC and amended his complaint as of right on May 5, 2008. (Docket No. 5.) Cathay, which may not exist, was not served with process and was dismissed without prejudice on April 10, 2009. (Docket No. 17.) Holder has not appeared or filed a responsive pleading. Discovery in this case is closed, and Morrison now moves for summary judgment dismissing all claims against him.

For the reasons explained, the summary judgment motion is granted with respect to plaintiff's claims for negligence, misappropriation of funds, and portions of the breach of fiduciary duty claims because they are time barred under New York law and no equitable doctrine precludes the assertion of this defense. Plaintiff knew or should have known of all elements of these claims more than three years prior to the initiation of this action, *i.e.* prior to April 18, 2005. Summary judgment is granted dismissing the breach of contract claim with respect to the Escrow Agreement because plaintiff has not come forward with evidence that any provision thereof has been breached and with respect to the Participating Revenue Certificate because plaintiff has not come forward with any evidence that the defendant was a party to that agreement. The summary judgment motion is denied with respect to plaintiff's claims for fraud, and the remaining breach of fiduciary duty and breach of contract claims.

JURISDICTION

This Court has diversity jurisdiction pursuant to 28 U.S.C § 1332(a)(2), which grants original jurisdiction to district courts for actions between "citizens of a State and citizens or subjects of a foreign state" when the amount in controversy is greater than $75,000, exclusive of interest and costs. Here, plaintiff is a Turkish national with a residence in Istanbul, Turkey. (Pl. Yako Ruso's Rule 56.1 Statement ("Pl. Rule 56.1" or "Pl. Response") at ¶ 1); (Def. Edward A. Morrison's Rule 56.1 Statement ("Def. Rule 56.1") at ¶ 1.) Defendants are citizens of New York and

Nevada. (Def. Rule 56.1 Statement at ¶¶ 2–4; Pl. Response at ¶¶ 2–4.) The amount in controversy is at least $2.5 million dollars. (*See, e.g.,* Am. Compl. at ¶ 44.)

BACKGROUND

In addressing defendant's motion, I have considered only plaintiffs version of the facts and such other facts as are not disputed by the plaintiff. Where multiple inferences may be drawn from the facts, I have drawn the inference most favorable to the plaintiff as the nonmovant. *See Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.,* 444 F.3d 158, 162 (2d Cir.2006).

Ruso is a sixty-eight year-old retired metallurgic engineer. (Aff. of Yako Ruso in Opp'n to Def.'s Mot. for Summ. J. ("Ruso Aff.") at ¶ 1.) He owns several large parcels of real estate in Turkey. (*Id.* at ¶ 2.) In early 2003, Ruso was contacted by Freek Posthumus ("Posthumus"), a Belgium broker, in response to his internet inquiries regarding potential financing of a real estate development project. (*Id.* at ¶ 9.) Posthumus put Ruso in contact with Serpieter Francis ("Francis") in 2003 with respect to potential investments in America. (Def. Rule 56.1 at ¶ 10; Pl. Response at ¶ 10.) Francis informed Ruso that he could earn risk-free returns of up to 100% per week for a 40 week commitment of funds. (Def. Rule 56.1 at ¶¶ 10–11; Pl. Response at ¶¶ 10–11.) At the time, Ruso questioned whether such an investment was "too good to be true," (Pl. Rule 56.1 ¶ 13), but was convinced by Francis and Posthumus that the promised results were not "too good to be true." (Def. Rule 56.1 ¶¶ 13–16; Pl. Response at ¶¶ 13–16.) Ruso claims that he is not a sophisticated investor. (Ruso Aff. at ¶¶ 6–8.) Prior to this investment, Ruso invested only in real estate transactions. (*Id.* at ¶ 6.)

Ruso then sought advice from Norens Thomas ("Thomas"), a French broker, and reviewed paperwork from Thomas that explained the investments. (Def. Rule 56.1 at ¶¶ 17–19; Pl. Response at ¶¶ 17–19.) Francis, Posthumus, and Thomas each represented to Ruso that he would receive the first payment of investment income within 45 days of the investment. (Def. Rule 56.1 at ¶ 22; Pl. Response at ¶ 22.) The "conversations and representations, designed to encourage Mr. Ruso to participate, occurred prior to Mr. Ruso's introduction to Mr. Morrison." (Def. Rule 56.1 at ¶ 24; Pl. Response at ¶ 24.) In early May 2003, Thomas introduced Ruso to Morrison. (Ruso Aff. at ¶ 16.)

Ruso thereafter flew to New York to meet with Morrison in order to discuss the potential transaction and set up a bank account. (Def. Rule 56.1 at ¶ 55; Pl. Response at ¶ 55.) Morrison made similar representations to those received from Francis, Posthumus, and Thomas. (*See* Pl. Rule 56.1 at ¶ 24.) Ruso transferred $4.5 million into the bank account to be used for the proposed investment. (Def. Rule 56.1 at ¶ 56; Pl. Response at ¶ 56.) Ruso did not perform any due diligence with respect to the investment, other than his discussions with Posthumus, Francis and Thomas and his trip to New York, during which he received various verbal representations from Morrison. (Pl. Rule 56.1 at ¶ 28.) Ruso believed that Morrison "appeared reliable and trustworthy" and Morrison's occupation as an attorney "played a big part in [Ruso's] willingness to put [his] trust in [Morrison]." (Ruso Aff. at ¶¶ 19–20.) Morrison's Jewish heritage also "played a significant role" in Ruso's decision to participate in the investment; Ruso states that he is Jewish. (*Id.* at ¶¶ 21–22.) Ruso did not send any of the investment documents to his legal counsel for review. (Def. Rule 56.1 at ¶ 31; Pl. Response at ¶ 31.)

Morrison explained to Ruso that a "provider" or "trader" with expertise in trading and investing would set up an investment program which required a minimum initial investment of $100 million. (Ruso Aff. at ¶¶ 24–25.) Morrison refused to disclose the names of the provider and the leading investor. (*Id.*) Morrison told Ruso that $300,000 of Ruso's investment would be used to pay for the costs and expenses necessary to secure the leading investor's money. (*Id.* at ¶ 26.) Morrison also told Ruso that his money would be refunded after the leading investor's funds were received and, in consideration for Ruso's payment of the costs, his funds would be included in the larger investment program. (*Id.*)

Morrison assured Ruso that any funds he transferred would be secured by what Ruso vaguely refers to as "bank instruments or bank guarantees from the provider." (*Id.* at ¶ 27.) On May 8, 2003, before leaving the United States, Ruso executed an Escrow Agreement with Morrison. (*Id.* at ¶ 37.) The Escrow Agreement designated Morrison as the escrow agent for an account which was to receive profits realized under the Joint Participation Agreement ("JPA"). (*Id.; see* Am. Compl. Ex. B.) As the escrow agent, Morrison had various duties relating to distribution of the profits in the escrow account. (*See* Am. Compl. Ex. B.)

After Ruso returned to Turkey, Morrison sent him the JPA and Specific Power of Attorney ("PoA") for execution. (Ruso Aff. at ¶¶ 30–31, 38.) The JPA was executed on or about May 12, 2003 between Ruso and Cathay. (*Id.* at ¶ 31.) Morrison signed on behalf of Cathay. (*Id.*) Ruso never sought and Morrison never produced any proof as to the existence of Cathay or Morrison's authority to bind Cathay to the contract. (*See* Aff. of Edward Morrison in Supp. of Mot. for Summ.

J., Ex. C, Dep. Tr. of Yako Ruso, 104:7–9; Ruso Aff. at ¶ 31.)

Ruso executed the PoA on May 26, 2003. (Ruso Aff. at ¶ 38.) The PoA authorized Morrison to sign documents, including the Participating Revenue Certificate ("PRC"), on Ruso's behalf, to transfer Ruso's funds to the trader's account, and to obtain guarantees from the provider for the value of Ruso's investment. (*Id.*; Am. Compl. Ex. C.) The PoA required Morrison to "make safe [Ruso's] interests by executing any and all operations through secure protocols and procedures ...." (Am. Compl. Ex. C. at ¶ 2.) Ruso believed that Morrison retained an obligation to seek authorization prior to withdrawing any funds from his account, despite the authorized uses granted by the PoA. (Ruso Aff. at ¶ 40; *see* Am. Compl. Ex. C at ¶ 3.)

On or about May 29, 2003, Morrison transferred approximately $308,259 out of Ruso's account to a bank account in Spain. (Def. Rule 56.1 at ¶ 59; Pl. Response at ¶ 59; Ruso Aff. at ¶ 53.) Ruso received notification of the transfer from his bank on June 13, 2003. (Ruso Aff. at ¶ 53.) Ruso believed that there was "no legitimate reason" for the disbursement, (*id.* at ¶ 54.), and became worried about the transfer of the funds on or about June 17, 2003. (Def. Rule 56.1 at ¶ 60; Pl. Response at ¶ 60.) Ruso wrote to Thomas and subsequently emailed Morrison to express his concerns about the transfer. (Def. Rule 56.1 at ¶¶ 60–62; Pl. Response at ¶¶ 60–62.) Morrison responded by offering to allow Ruso to terminate his participation, which Ruso declined. (Def. Rule 56.1 at ¶¶ 62, 64; Pl. Response at ¶¶ 62, 64.)

After several delays, Morrison executed the PRC on Ruso's behalf on July 30, 2003, with Holder signing as the provider and trader. (Def. Rule 56.1 at ¶¶ 45–47; Pl. Response at ¶¶ 45–47.) The PRC provided

that a specific amount of return on the investment would be generated when the program commenced. (Def. Rule 56.1 at ¶ 49; Pl. Response at ¶ 49; *see* Am. Compl. Ex. D.)

On August 1, 2003, Morrison informed Ruso that he obtained an alternative "guarantee" to secure his investment in the form of an assignment of stock certificates. (Ruso Aff. at ¶¶ 75–78.) Morrison refused to let Ruso see the "guarantee," which Ruso found "extremely troublesome." (*Id.* at ¶ 81.) Ruso did not seek further information regarding the guarantee until December 2004. (Ruso Aff. at ¶ 82.)

On August 14 or 15, 2003, Ruso received notification from the bank that Morrison had transferred $125,000 from the account on August 1, 2003 to Oxford III, LLC. (Def. Rule 56.1 at ¶ 65; Pl. Response at ¶ 65; Ruso Aff. at ¶ 58.) Ruso was "shocked" by the transfer because he had not authorized it. (Def. Rule 56.1 at ¶ 65; Pl. Response at ¶ 65,) Ruso also did not understand the reason for the transfer because he was "under the impression" that none of his money would be transferred, other than the initial $308,000, until it was to be invested with the leading investor's funds. (Ruso Aff. at ¶ 61.)

On or about September 30, 2003, Morrison transferred $40,000 to Oxford III, LLC. (*Id.* at ¶ 62.) Ruso again "questioned" the transfer. (*Id.*) Then, on or about October 3, 2003, Morrison transferred the remaining $4,026,500 from Ruso's account. (Def. Rule 56.1 at ¶¶ 66–67; Pl. Response at ¶¶ 66–67.) Ruso learned of the transfer when he received his bank statement. (Pl. Rule 56.1 ¶ 68.) Ruso questioned Morrison about this transfer and was told that the money was being "consolidated" for the trader. (Ruso Aff. at ¶ 65.)

Morrison informed Ruso that the money would not be invested in the original transaction contemplated by the parties but advised him that it would be included in the next available trade with the provider. (Pl. Rule 56.1 at ¶¶ 57–58; Def. Rule 56.1 at ¶¶ 57–58.)

Ruso became increasingly concerned that he might not be able to get his money back, and decided to seek a return of the $2 million under the pretext of needing funds to make a "tax payment." (Def. Rule 56.1 at ¶ 72; Pl. Response at ¶ 72; Ruso Aff. at ¶¶ 89, 92.) On or about October 29, 2003, after consulting with Holder, Morrison transferred $2 million from the account back to Ruso as a loan. (Def. Rule 56.1 at ¶ 69; Pl. Response at ¶ 69.)

Beginning in early 2004, Ruso repeatedly requested that Morrison send him an accounting since the investment program never took place. (Ruso Aff. at ¶ 68.) Morrison directed Ruso to seek an accounting from Holder instead. (*Id.* at ¶ 69.) Holder later denied knowledge that the funds were ever in his possession or control. (*Id.* at ¶ 70.)

Concerned about his investment, Ruso traveled to Nevada to meet with Holder on June 7, 2004. (Def. Rule 56.1 at ¶ 73; Pl. Response at ¶ 73.) During that meeting, Holder informed Ruso that he only received $300,000 from Morrison and not the $4.5 million which Ruso believed was transferred. (Ruso Aff. at ¶ 114.) Holder executed a promissory note which committed Oxford III, LLC to pay Ruso the outstanding $2.5 million, with interest.[1] (Def. Rule 56.1 at ¶ 73; Pl. Response at ¶ 73.) Ruso and Holder also executed an Option to Purchase in which Oxford III,

---

1. Ruso initially had transferred $4.5 million to Morrison in May 2003. He received $2 million of his money as a "loan" in October 2003, leaving a balance of $2.5 million.

LLC agreed to purchase stock from Ruso's corporation for $100 million and an Option to re-Purchase which provided that Oxford III, LLC granted Ruso the option to repurchase the stock within 30 days or less from the original purchase date. (Def. Rule 56.1 at ¶¶ 74–75; Pl. Response at ¶¶ 74–75.) Morrison did not attend this meeting and was unaware of the new agreements between Ruso and Holder. (Def. Rule 56.1 at ¶¶ 73, 77; Pl. Response at ¶¶ 73, 77.) Ruso considered the June 2004 agreements with Holder to constitute a completely new and separate transaction. (Def. Rule 56.1 at ¶ 80; Pl. Response at ¶ 80.)

In July 2004, Holder informed Ruso that the leading investor for the investment program fell through and the trade could not be done. (Ruso Aff. at ¶ 126.) Ruso began contemplating a lawsuit against Morrison and Holder on July 17, 2004. (Def. Rule 56.1 at ¶ 84; Pl. Response at ¶ 84.) Ruso communicated with Holder regarding a return of his money, but received various excuses from Holder. (Ruso Aff. at ¶¶ 127–29.) In December 2004, Ruso suggested that Morrison file legal action against Holder, but Morrison advised him to be patient. (*Id.* at ¶ 133.) At that time, Ruso renewed his request to see the guarantees that Morrison had obtained to secure Ruso's investment. (*Id.* at ¶ 82.) After Ruso agreed to declare Holder in default of the transaction, Morrison agreed to give him a copy of the guarantee and Ruso realized that it was worthless. (*Id.* at ¶ 84.)

Ruso again discussed filing an action against Holder in October 2005, but Morrison continued to advise him to be patient. (*Id.* at ¶ 134.) Ruso hired an attorney in September 2006 who obtained a copy of a letter from Morrison to Holder which revealed exactly how the funds were disbursed. (*Id.* at ¶ 136.) Morrison disbursed the funds for various expenses related to the transaction, a loan to an individual, and his attempts to "secure a non-existing leading investor by making payments to individuals in foreign countries that were actually scheming and defrauding Morrison." (*Id.* at ¶¶ 138–140.) Ruso did not file a complaint until April 18, 2008.

SUMMARY JUDGMENT STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he is entitled to relief. A fact is material if it "might affect the outcome of the suit under the governing law . . . ." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence on each material element must be sufficient to entitle the movant to relief in its favor as a matter of law. *Vt. Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004).

■ When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and "may not rely merely on allegations or denials" of the facts asserted by the movant. Rule 56(e)(2), Fed.R.Civ.P. In raising a triable issue of fact, the nonmovant carries only a "limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue

for trial.'" *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir.2004) (quoting *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir.1993)).

An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir.1995) (internal quotations and citations omitted); *accord Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In reviewing a motion for summary judgment, the court must scrutinize the record, and grant or deny summary judgment as the record warrants. Rule 56(c). In the absence of any disputed material fact, summary judgment is appropriate. *Id.*

■ Mere "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir.1996) (citing *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348); *see also Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (noting that summary judgment may be granted if evidence is "merely colorable" or "not significantly probative") (citations omitted). "An opposing party's facts must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions." *Contemporary Mission, Inc. v. U.S. Postal Serv.*, 648 F.2d 97, 107 n. 14 (2d Cir.1981).

DISCUSSION

## I. *Negligence*

■ Plaintiff asserts a claim for negligence against Morrison for "recklessly and negligently releas[ing] the plaintiffs funds by failing to investigate, authenticate or secure any guarantees or proper security or provide safety for the funds released." (Am. Compl. ¶ 52.) Defendant raises the statute of limitations as a defense, and seeks dismissal of this cause of action as untimely.

■ Under New York law, a negligence claim accrues on the date of the injury. *See Atlantic Balloon & Novelty Corp. v. Am. Motorists Ins. Co.*, 62 A.D.3d 920, 922, 880 N.Y.S.2d 112 (N.Y.App. Div. 2d Dep't 2009). "Stated another way, accrual occurs when the claim becomes enforceable, i.e., when all elements of the tort can be truthfully alleged in a complaint." *See Barrell v. Glen Oaks Village Owners, Inc.*, 29 A.D.3d 612, 613, 814 N.Y.S.2d 276 (N.Y.App. Div. 2d Dep't 2006) (quoting *Snyder v. Town Insulation*, 81 N.Y.2d 429, 435, 599 N.Y.S.2d 515, 615 N.E.2d 999 (1993)). Here, the alleged injury occurred when Morrison transferred the funds out of Ruso's account pursuant to the PoA. Prior to the transfers, there had been a failure to obtain guarantees, security, or provide safety for the released funds and, therefore, injury occurred when the transfers were made. The transfers by Morrison occurred on May 29, 2003, August 1, 2003, September 30, 2003, and October 3, 2003. (Ruso Aff. at ¶¶ 53, 58, 62–63.) Ruso received notification of the transfers on June 13, 2003, August 14, 2003, and on or about October 3, 2003. (*See id.*) As such, the latest possible accrual date for so much of the negligence claim as is based on Morrison's transfer of the funds without a guarantee was October 3, 2003.

■ To the extent that Ruso asserts a negligence claim based on Morrison's negligence in investigating and authenticating the "alternative form of guarantee" that he obtained on or about August 1, 2003, the claim would not have accrued until Ruso was injured.

■ "A contract of guaranty is a promise to answer for the payment of some debt or the performance of some obligation owed by another." *See Daewoo Int'l Am. Corp. Creditor Trust v. SSTS Am. Corp.*, 2004 WL 1488511 at *4 (S.D.N.Y. July 2, 2004). "It is but an inchoate obligation since the condition precedent to its operation (*viz.* default by the debtor) may never occur." *Michaels v. Chem. Bank*, 110 Misc.2d 74, 441 N.Y.S.2d 638, 640 (N.Y.Sup.Ct.1981) (determining that the injury did not occur until there was a default of the original agreement). The claim accrues "from the injury, not from the post-injury point when the injured party sees 'no hope of being indemnified … without legal action.'" *Giannacopoulos v. Credit Suisse*, 37 F.Supp.2d 626, 629 (S.D.N.Y.1999). Ruso was not injured by Morrison's negligence in failing to adequately investigate or authenticate the "guarantee" until there was a default on the original agreement. At that point, the "guarantee" became effective and its inadequacy caused Ruso to be injured.

Here, Ruso's injury from an alleged failure to investigate the alternative from of "guarantee" occurred, at the latest, on June 7, 2004 when he visited Holder in Nevada to inquire about his investment and the "guarantee." (*See* Ruso Aff. at ¶¶ 108–124.) At that time, Holder informed Ruso that the collateral obtained by Morrison as a "guarantee" was "worth-

less because [Holder] had cancelled those shares." (*Id.* at ¶ 123.) Holder did not pay Ruso any money with respect to the "guarantee." (*See id.* at ¶ 124.)

The statute of limitations requires that a claim for negligence under New York law must be brought within three years. N.Y. C.P.L.R. § 214. Because the claim accrued on or before June 7, 2004, the claim was untimely as of June 7, 2007. The complaint was not filed until April 18, 2008.

Plaintiff raises the discovery rule doctrine, the doctrine of equitable estoppel, and the doctrine of equitable tolling in response to defendant's statute of limitations defense.[2] For the reasons stated below, none of these doctrines save plaintiff's untimely claims.

### A. Discovery Rule Doctrine

■ Plaintiff attempts to rely on the discovery rule as it is set forth in section 203(g), N.Y. C.P.L.R. That section postpones the accrual of a cause of action "from the time when the tort is complete to the time when the plaintiff has discovered sufficient facts to make him aware that he has a cause of action." *See Leeming v. Dean Witter Reynolds Inc.*, 676 F.Supp. 541, 544 n. 2 (S.D.N.Y.1988). The discovery rules applies only in a very limited number of circumstances. *Id.* Typically, these instances are limited to actions involving allegations of fraud. *See Prestandrea v. Stein*, 262 A.D.2d 621, 692 N.Y.S.2d 689 (N.Y.App. Div. 2d Dep't 1999); *Ross v. Louise Wise Servs., Inc.*, 4 Misc.3d 279, 283–84, 777 N.Y.S.2d 618 (N.Y.Sup.Ct. 2004) ("[T]here is no authority to apply the discovery rule set forth in CPLR § 203(g)

---

2. The doctrine of equitable estoppel is sometimes referred to as the doctrine of equitable tolling. However, because federal courts distinguish between the two doctrines, they will be analyzed separately here. *See Tenamee v. Schmukler*, 438 F.Supp.2d 438, 443 n. 3 (S.D.N.Y.2006).

to ... causes of action other than fraud ....").

■ Furthermore, even if the discovery rule applies to claims other than fraud, it is limited to those instances in which the plaintiff is "blamelessly ignorant of the existence of cause of his injury." *See Leeming,* 676 F.Supp. at 544 n. 2. Where the plaintiff has knowledge of his claim or of facts which would have prompted a reasonable person using due diligence to discover the claim, the discovery rule does not extend the time within which the plaintiff must bring his claim.

■ Plaintiff admits that "[b]y the beginning of October 2003, it was becoming apparent that Morrison had been disbursing [Ruso's] money without [his] consent, Morrison transferred the remaining balance out of [Ruso's] account without security and there were no returns from [his] investment." (Ruso Aff. at ¶ 88.). Plaintiff also admits that he "immediately" knew that "Holder was nothing more than a hustler" upon meeting him on June 7, 2004 and that Holder informed him at that time that Morrison had not transferred any funds other than the initial $300,000. (*Id.* at ¶¶ 111, 113–14.) He also wrote to Morrison on October 8, 2004 and said, "Ed, I no longer believe Paul [Holder] will or can pay any money to me." (Ruso Aff. Ex. W.)

Plaintiff "discovered sufficient facts to make him aware that he ha[d] a cause of action" before April 18, 2005. Therefore, even if the discovery doctrine were broad enough to cover causes of action other than fraud, it would not provide a shield sufficient to save plaintiff's negligence claim from the three year statute of limitations.

B. *Doctrine of Equitable Estoppel*

■ Under the doctrine of equitable estoppel, a court has the "power to bar the application of the statute of limitations due to the representations or conduct by a party which induces the opposing party to postpone bringing suit on a known cause of action, or which fraudulently conceals an action unknown to the opposing party." *See Abercrombie v. Andrew College,* 438 F.Supp.2d 243, 265 (S.D.N.Y.2006).

■ In order for the doctrine of equitable estoppel to apply, a plaintiff must "articulate ... acts by defendant[ ] that prevented [plaintiff] from timely commencing suit ...." *Abbas v. Dixon,* 480 F.3d 636, 642 (2d Cir.2007). Evidence that the plaintiff "was the victim of fraud, misrepresentations, or deception" alone is insufficient unless the plaintiff demonstrates that "those circumstances prevented him from timely filing his complaint." *Id.* (internal quotations omitted).

■ Here, plaintiff argues that "[w]ithout an accounting of the disbursements, obtained in September 2006, [he] could never realize the extent of the Defendant's fraud." (Pl. Opp. Br. at 11.) Defendant's failure to provide plaintiff with an accounting did not, however, prevent plaintiff from initiating a legal action. The law does not permit equitable tolling when a party simply did not realize the "extent" of his claim. Instead, equitable tolling is only available when the party is unable, through due diligence, to discover that he has any claim at all. *See Abercrombie v. Andrew College,* 438 F.Supp.2d 243, 266 (S.D.N.Y.2006).

All that is needed to commence the running of the statute is knowledge of facts sufficient to suggest to a person of ordinary intelligence the probability that he has been defrauded. Thus, where a plaintiff possesses timely knowledge sufficient to place him or her under a duty to make inquiry and ascertain all the relevant facts prior to the expiration of

the applicable statute of limitations, there can be no justifiable reliance, and equitable estoppel is inapplicable. *Id.*

Plaintiff admits that he was contemplating filing a suit against Morrison and Holder in 2004. (Def. Rule 56.1 at ¶ 84; Pl. Response at ¶ 84.) Because plaintiff has not come forward with evidence that acts or conduct by the defendant prevented him from filing a complaint prior to April 18, 2005, the doctrine of equitable estoppel does not save his untimely claim.

C. *Doctrine of Equitable Tolling*

 "[W]here fraud or concealment of the existence of a claim prevents an individual from timely filing, equitable tolling of a statute of limitations is permitted until the fraud or concealment is, or should have been, discovered by a reasonable person in the situation." *Iavorski v. U.S. I.N.S.*, 232 F.3d 124, 134 (2d Cir.2000). "[E]quitable tolling requires a party to pass with reasonable diligence through the period it seeks to have tolled." *Id.*

 Although whether a plaintiff exercised reasonable due diligence to discover his claim is often a question of fact, a person may fail as a matter of law to satisfy this obligation. *Id.* Such is the case when it is "reasonable to assume that [plaintiff] should have known that he had [a claim] well before the end of the ... period he seeks to toll." *Id.*

 The question is not whether the plaintiff had all of the information available to him, but instead, "whether plaintiff knew enough to sue." *See Statistical Phone Philly v. NYNEX Corp.*, 116 F.Supp.2d 468, 482 (S.D.N.Y.2000); *see also Paige v. Police Dep't of City of Schenectady*, 264 F.3d 197, 200 (2d Cir.2001) ("Although some of the facts putatively concealed by the defendants might have strengthened [plaintiff's] case by corroborating her story, ... the absence of those facts did not sufficiently justify [plaintiff's failure to] pursu[e] her cause of action as to merit equitable tolling.")

 Furthermore, even where the doctrine of equitable tolling applies, "[t]he plaintiff bears the burden of showing that the action was brought within a reasonable period of time after the facts giving rise to the equitable tolling or equitable estoppel claim 'have ceased to be operational.'" *Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir.2007). New York courts have held that "in no event will the plaintiff be found to have exercised the required diligence if his action is deferred beyond the date which would be marked by the reapplication of the statutory period, i.e., that the length of the statutory period itself sets an outside limit on what will be regarded as due diligence." *See Simcuski v. Saeli*, 44 N.Y.2d 442, 450–51, 406 N.Y.S.2d 259, 377 N.E.2d 713 (1978). Therefore, equitable tolling will not save plaintiff's claim unless a reasonable person in his situation, through the exercise of due diligence, would not have been able to bring a cause of action until on or after April 18, 2005.

"The test regarding when a plaintiff should have discovered an alleged fraud is an objective one." *Prestandrea v. Stein*, 262 A.D.2d 621, 622, 692 N.Y.S.2d 689 (N.Y.App. Div. 2d Dep't 1999).

> [W]here the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him.

*Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir.1983) (citing *Higgins v. Crouse*, 147 N.Y. 411, 416, 42 N.E. 6 (1895)).

■ Here, plaintiff claims that he did not discover the facts necessary to commence an action until September 2006 when his new attorney demanded an accounting of all disbursements made by Morrison. (*See* Ruso Aff. at ¶ 141.) Although plaintiff argues that all of the evidence "point[s] to the fact that at all times Mr. Ruso believed that Defendant Morrison was acting in his best interests" (Pl. Br. at 6), the undisputed evidence in the record indicates that not only was Ruso suspicious of Morrison, but he in fact threatened to sue Morrison in 2004, over two years before he claims to have learned of facts sufficient to put him on notice that he had been injured. (*See, e.g.*, Def. Rule 56.1 at ¶¶ 72, 84; Pl. Response at ¶¶ 72, 84; Ruso Aff. at ¶¶ 65–69, 81–82, 88–89, 92–94, 113.)

For example, plaintiff admits that he was "anxious and concerned that all was not going as planned" in October 2003 but he was reassured by Morrison's and Thomas's repeated promises that a payoff was "imminent." (Ruso Aff. at ¶¶ 89–90.) Indeed, in October 2003, Ruso used a pretext of needing money and agreed to accept a return of $2 million as a "loan" in an attempt to recover some of his money. (*Id.* at ¶ 92.) Morrison transferred the $2 million to Ruso, which he accepted as a loan because "at th[at] point, [he] was very concerned about getting any of [his] money returned." (*Id.* at ¶ 94.) A reasonable person with such suspicions would have taken action at some point in response to Morrison's "continued assur[ances] … that the transaction was imminent and was always a week or so away." (*See id.* at ¶¶ 95–106.)

Plaintiff admits that he realized that Holder was "nothing more than a hustler" and, had any due diligence been done with respect to Holder's credentials, this would have been easily revealed because he realized it "immediately" upon meeting Holder in June 2004. (Ruso Aff. at ¶ 113.)

Based on plaintiff's admissions and the undisputed record, plaintiff was "on notice that something might be amiss." *See Beckles v. George*, 2008 WL 926578 at *6 n. 4 (S.D.N.Y. Mar. 31, 2008). The doctrine of equitable tolling does not apply because of plaintiff's failure to exercise due diligence in discovering the alleged fraud concealing the additional facts which would have informed him of his cause of action. The defendant's motion for summary judgment with respect to the negligence cause of action is granted on the ground that the claim is time barred.

## II. *Misappropriation of Funds*

Plaintiff alleges that defendant misappropriated his funds by making a disbursement of $271,775.00 in the form of a loan to a third party on or about October 27, 2003. (*See* Am. Compl. ¶¶ 64–66.) Defendant raises the statute of limitations as an affirmative defense to this claim.

■ A claim for misappropriation of funds is subject to a three year statute of limitations in New York. *See* N.Y. C.P.L.R. § 214(3); *see also Ryder v. Sheldon*, 69 A.D.2d 768, 769, 415 N.Y.S.2d 35 (N.Y.App. Div. 1st Dep't 1979) (applying section 214(3)'s three year statute of limitations for recovery of chattels to a claim for conversion of bank accounts). "[W]hen a claim is brought against the alleged 'thief' of the goods, the statute 'runs from the time of the theft … even if the property owner was unaware of the theft at the time that it occurred.'" *Lennon v. Seaman*, 63 F.Supp.2d 428, 439–40 (S.D.N.Y. 1999). Here, the transfer was made on or about October 27, 2003. (Ruso Aff. at ¶ 138, Ex. J at 1.) Accordingly, plaintiff's misappropriation of funds claim became untimely as of October 27, 2006.

Plaintiff asks the Court to hold that the claim is timely based on the discovery rule doctrine, equitable estoppel, and equitable tolling. For the reasons stated above, none of these doctrines save plaintiff's misappropriation claim. *See supra* I(a)-(c). Ruso was aware as of approximately October 2003 that his funds had been transferred out of his account in a way that he believed violated his contract and he was concerned that he would not receive them back, even though he may not have been aware of the mechanics of the transfer. (*See* Ruso Aff. at ¶¶ 53–65, 69, 72.) Such knowledge is sufficient to put a person of ordinary intelligence on notice that he has a claim and bars application of the discovery rule and the doctrines of equitable estoppel and equitable tolling. *See supra* I(a)-(c). Plaintiff did not pursue his claim with the required due diligence. Therefore, the defendant's motion for summary judgment with respect to the cause of action for misappropriation of funds is granted.

### III. *Fraud*

In order to succeed on a claim for fraud under New York law, a plaintiff must plead and prove "a misrepresentation or a material omission of fact which was false and known to be false by defendant; made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996).

Defendant moves for summary judgment on the fraud claim on two independent bases: (1) the fraud claim should be governed by a three year statute of limitations and is thus time-barred, and (2) the fraud claim fails as a matter of law. Under New York law, a claim for fraud

accrues at the time that the plaintiff "possesses knowledge of facts from which the fraud could have been discovered with reasonable diligence." *Oggioni v. Oggioni*, 46 A.D.3d 646, 648, 848 N.Y.S.2d 245 (N.Y.App. Div. 2d Dep't 2007).

The statute of limitations for a fraud claim asserted under New York law is generally six years. N.Y. C.P.L.R. § 213(8). An exception applies when the plaintiff merely adds a scienter allegation to a claim governed by a shorter limitations period in order to make use of the longer statute of limitations for a fraud claim. *See N.Y. Seven–Up Bottling Co., Inc. v. Dow Chem. Co.*, 96 A.D.2d 1051, 1052–53, 466 N.Y.S.2d 478 (N.Y.App. Div. 2d Dep't 1983), *aff'd*, 61 N.Y.2d 828, 473 N.Y.S.2d 973, 462 N.E.2d 150 (1984).

Here, plaintiff's allegations of scienter are not merely incidental to the overarching fraud allegations. *See id.* The claim is based on allegations of intentional misrepresentations made by the defendant in order to convince the plaintiff to transfer his money into the defendant's bank account. Therefore, the exception does not apply and the fraud claim was timely under the six year statute of limitations since it accrued no earlier than the first interaction between Ruso and Morrison in or around May 2003. (*See* Ruso Aff. at ¶ 17.)

There remains an issue of fact as to whether plaintiff reasonably relied upon any fraudulent misrepresentations made by the defendant. Ruso relied on Morrison's statements because he believed that Morrison "appeared reliable and trustworthy." (Ruso Aff. at ¶ 19.) Morrison's occupation as an attorney "played a big part in [Ruso's] willingness to put [his] trust in [Morrison]." (Ruso Aff. at ¶¶ 19–20.) Ruso was further influenced by Morrison's Jewish heritage, which he said "played a

significant role" in his decision to participate in the investment. (*Id.* at ¶ 22.) Whether such reliance was reasonable, when plaintiff was "very skeptical of the investment transaction," (*id.* at ¶ 23), but opted not to perform other due diligence, is a question for the trier of fact. *See Swersky v. Dreyer & Traub,* 219 A.D.2d 321, 327, 643 N.Y.S.2d 33 (N.Y.App. Div. 1st Dep't 1996). Because issues of material fact remain, defendant's motion for summary judgment with respect to the fraud claim is denied.

### IV. *Breach of Fiduciary Duty*

■ "A cause of action for breach of fiduciary duty is governed by a six-year statute of limitations where the relief sought is equitable in nature, *see* N.Y. C.P.L.R. § 213(1), or by a three-year statute of limitations where the only relief sought is money damages." *Weiss v. TD Waterhouse,* 45 A.D.3d 763, 764, 847 N.Y.S.2d 94 (N.Y.App. Div. 2d Dep't 2007). There is an exception to the three year statute of limitations for claims seeking money damages for breach of fiduciary duty claims that sound in actual fraud, in which case a six-year statute of limitations applies. *See Kaufman v. Cohen,* 307 A.D.2d 113, 119, 760 N.Y.S.2d 157 (N.Y.App. Div. 1st Dep't 2003). Courts do not apply this exception if "the fraud allegation is only incidental to the claim asserted." *Id.* Therefore, in some instances, the timeliness of the breach of fiduciary duty claim may be dependent on the viability of the fraud claim. *Id.*

■ Breach of fiduciary duty claims which seek monetary damages and are based on the failure to exercise reasonable care and diligence are subject to a three year statute of limitations. *See Balta v. Ayco Co., LP,* 626 F.Supp.2d 347, 357 (W.D.N.Y.2009). Here, the Amended Complaint alleges that defendant "breach-ed his fiduciary duty by failing to protect the plaintiff's funds and released said funds without investigating the nature of the investment or risks involved" and "made loans to individuals in excess of $270,000.00 and released other funds without any legitimate reason to release said funds." (Am. Compl. ¶¶ 60–61.) To the extent that the complaint sets forth a cause of action for breach of fiduciary duty based on defendant's failure to protect plaintiff's investment, the claim is time-barred by the three year statute of limitations. The discovery rule and the doctrines of equitable estoppel and equitable tolling do not save this claim for the reasons discussed above. *See supra* I(a-c).

■ To the extent, however, that the Amended Complaint alleges breach of fiduciary duty based on Morrison's representations to the plaintiff regarding the investment structure and risk level, the claim is subject to a six year statute of limitations which accrued at the time that the statements were made in 2003. (*See* Am. Compl. at ¶ 59.) ("Morrison, as an attorney at law and as a recipient of a Power of Attorney, pursuant to agreement, had a fiduciary duty, in that he represented to the plaintiff these funds would be used for investments that were secure and protected and that prior to releasing any funds, the investment would be sound and he would secure proper security or collateral."). Because the action was filed on April 18, 2008, the claim is timely.

■ In order to establish a claim for breach of fiduciary duty, a plaintiff must prove the existence of a fiduciary relationship, misconduct by the defendant, and damages that were directly caused by the defendant's misconduct. *See Daly v. Kochanowicz,* 67 A.D.3d 78, 95, 884 N.Y.S.2d 144 (N.Y.App. Div. 2d Dep't 2009). Here, plaintiff claims that defendant owed him a fiduciary duty as an attorney at law and as

his attorney-in-fact under the PoA. (Am. Compl. at ¶ 59.)

■■■■■ The general rule is that a written power of attorney creates a principal/agent relationship, which gives rise to a fiduciary duty. *See Northwestern Nat'l Ins. Co. of Milwaukee, Wis. v. Alberts*, 769 F.Supp. 498, 508 (S.D.N.Y.1991). The PoA establishes a fiduciary duty that Morrison owed to Ruso with respect to the subjects covered by the PoA. There is a question of fact regarding whether Morrison and Ruso were also engaged in an attorney-client relationship, which could independently establish a fiduciary duty owed by Morrison. *See Greene v. Greene*, 56 N.Y.2d 86, 92, 451 N.Y.S.2d 46, 436 N.E.2d 496 (1982) ("[T]he relationship between an attorney and his client is a fiduciary one and the attorney cannot take advantage of his superior knowledge and position."). Disputed issues of fact also remain with respect to whether Morrison engaged in misconduct in violation of his fiduciary duty to Ruso and the amount of damages that Ruso suffered as a result of Morrison's alleged misconduct. The defendant's motion for summary judgment on plaintiff's breach of fiduciary duty claim is denied insofar as the claim is based on defendant's misrepresentations to the plaintiff.

### V. *Breach of Contract*

Plaintiff alleges that Morrison "knowingly and intentionally breached the terms of [his] agreements with the plaintiff in that [he] failed to verify, authentic[ate], appropriately protect or structure any sound investment opportunity for plaintiff's funds." (Am. Compl. ¶ 46.) Although plaintiff does not identify the specific provisions that he claims were breached, he attaches the JPA, Escrow Agreement, PoA, and PRC as exhibits A–D to the Amended Complaint and alleges various breaches by Morrison.

### A. *JPA*

■■■ Ruso and Cathay entered into the JPA on May 12, 2003 between. (*See* Am. Compl. Ex. A.) Morrison signed the JPA on behalf of Cathay as "Attorney at Law." There is no proof that Cathay exists. (*See* Ruso Aff. at ¶ 31.) Defendant does not claim that he has any evidence that Cathay exists. (*See* Pl. Rule 56.1 at ¶ 102; Def. Response to Pl. Rule 56.1 Statement.)

■■■■■ When an individual executes a contract as an agent on behalf of a non-existent principal, the contract remains valid but is enforceable against the individual who claims to be an agent. *See Metro Kitchenworks Sales, LLC v. Cont'l Cabinets, LLC*, 31 A.D.3d 722, 723, 820 N.Y.S.2d 79 (N.Y.App. Div. 2d Dep't 2006). The same is true of an agent who executes a contract on behalf of a principal without authority to do so. *See id.; see also Wittenberg v. Robinov*, 9 N.Y.2d 261, 264, 213 N.Y.S.2d 430, 173 N.E.2d 868 (1961).

The JPA required Ruso to "provide the amount of five million United States Dollars ($5,000,000.00) with Fleet Bank as receiving bank." (*See* Am. Compl. Ex. A at 2.) Cathay was required to "verify, authenticate and appropriately protect and structure the amount of U.S. $5,000,000.00 ...." (*Id.* at 1.) Under the principles of agency law, Morrison may be liable to plaintiff under the contract with non-existent Cathay for damages resulting from Cathay's non-performance. *See Wittenberg*, 9 N.Y.2d at 264, 213 N.Y.S.2d 430, 173 N.E.2d 868. Defendant's motion for summary judgment on the breach of contract claim with respect to the JPA is denied.

### B. *Escrow Agreement*

■■■ The Escrow Agreement was executed on May 8, 2003 between Ruso, the "Client" and Morrison, the "Escrow Agent." (*See* Am. Compl. Ex. B at 1.) The

Escrow Agreement stated that the Morrison was "to receive the income derived from the investment of Five Million dollars" from the proposed investment program. (*Id.*) Its terms governed the distribution of the income paid to the escrow account and the repayment of various administrative expenses. (*Id.*) The Escrow Agreement specifically provided that Morrison could perform "other duties as an attorney at law on behalf of any of the investors" but that "[s]uch responsibilities shall be undertaken pursuant to separate retainer agreements . . . ." (*Id.* at 2.)

No income was received and, thus, no funds were deposited into any escrow account pursuant to the Escrow Agreement. The Escrow Agreement unambiguously only governed the income from the investment and not the initial deposit.[3] Therefore, defendant cannot be said to have breached the terms of this agreement. (*See* Ruso Aff. at ¶ 126.) To the extent that plaintiff seeks to recover for breach of the Escrow Agreement, the defendant's motion for summary judgment is granted.

### C. PoA

■■■ Ruso executed the PoA on May 8, 2003, appointing Morrison as his attorney-in-fact with respect to certain aspects of the proposed transaction. (*See* Am. Compl. Ex. C.) The agreement provided that Morrison was authorized to "open appropriate bank accounts, sign agreements, negotiate, hypothecate, [and] commit [Ruso's] funds and any and all funds involved in or resulting from financial activities with a view to achieving [Ruso's] rights and purposes." (*Id.* at ¶ 1.) Specifically, Morrison was authorized to use

Ruso's initial deposit, which was stated in the PoA to be $5 million but later reduced to $4.5 million, to make the "necessary arrangements with all the parties involved in order to grant [Ruso] his joining in a contract of an income enhancement program signed or to be signed between [Morrison] and [Holder] on behalf of a leading investor;" join Ruso's funds with the funds of the leading investor; obtain bank guarantees from Holder to secure the investment; and make bi-weekly payments of $6 million for forty weeks beginning six weeks after Morrison received the $5 million deposit in his escrow account. (*Id.* at ¶ 3.)

Under the PoA, Morrison was obligated to "make safe [Ruso's] interests by executing any and all operations through secure protocols and procedures that might contractually be set up with the relevant counterparts." (*Id.* at ¶ 2.)

The PoA set out the profit-sharing arrangement for the revenue that would be generated from the income investment program. (*Id.* at ¶ 4.) Ruso and Morrison were to receive 60 percent and 40 percent, respectively, of the profit. (*Id.*) Morrison was expressly permitted to withhold the provider's identity, but was required to "communicate any and all terms and conditions of the income enhancement program" to Ruso. (*Id.*) Finally, the PoA directed that in the event that Morrison, Holder, or the leading investor "should not grant [Ruso] any opportunities to enter an income enhancement program, no withdrawal whatever shall be made on [Ruso's] funds." (*Id.*)

---

**3.** Separate and apart from the Escrow Agreement, Morrison maintained an attorney escrow account. The parties dispute whether the separate escrow account was a general attorney escrow account, (*see* Pl. Rule 56.1 at ¶ 66), or a "separate attorney account" for Oxford III, LLC and Holder (Def. Rule 56.1 at ¶ 66.) Although the Escrow Agreement does not cover the initial deposit transferred to and from this account, the transfers may be redressable under plaintiff's claims for fraud, breach of fiduciary duty, or breach of contract claims based on the PoA and JPA.

There remain issues of fact as to whether the disbursements made by Morrison were in breach of his contractual obligations under the PoA and whether Morrison failed to use "secure protocols and procedures that might [have been] set up with the relevant counterparts." Defendant's motion for summary judgment dismissing the breach of contract claim with respect to the PoA is denied.

*PRC*

■ The Participating Revenue Certificate or PRC was entered on July 30, 2003 between Oxford III, LLC, executed by Holder as Managing Partner, and Ruso, executed by Morrison as his attorney in fact under the PoA. (*See* Am. Compl. Ex. D.) Unlike Cathay, there is no allegation that Oxford III, LLC is non-existent or not bound by the agreement. Because Morrison was not a party to the contract, he could not have breached it. *See Manhattan Real Estate Equities Group LLC v. Pine Equity N.Y., Inc.*, 27 A.D.3d 323, 323, 815 N.Y.S.2d 28 (N.Y.App. 1st Dep't 2006) ("[N]onparties to an agreement are not bound thereby."). Ruso does not allege, and there are no facts to suggest, that Morrison's execution of the PRC on behalf of Ruso was in excess of his authority as Ruso's agent under the PoA. In fact, the PoA expressly contemplates that Morrison would enter into the PRC on Ruso's behalf. (*See* Am. Compl. Ex. C at ¶ 4.) Defendant's motion for summary judgment on the breach of contract claim with respect to a breach of the PRC is granted.

*Morrison's Novation Defense is Without Merit*

■ Morrison argues that Ruso's agreements with Holder in June 2004 constituted novations of the contracts at issue in this case. "New York courts have set a stringent standard for novation." *See Abuelhija v. Chappelle*, 2009 WL 1883787,

at *6 (S.D.N.Y. June 29, 2009). A novation may occur when each of four elements is present: "a previous valid obligation, agreement of all parties to the new obligation, extinguishment of the old contract, and a valid new contract." *See Wasserstrom v. Interstate Litho Corp.*, 114 A.D.2d 952, 954, 495 N.Y.S.2d 217 (N.Y.App. Div. 2d Dep't 1985).

Morrison was not present during the negotiation and execution of the new agreements and Ruso did not inform him of their existence. (*See* Def. Rule 56.1 at ¶¶ 73–77; Pl. Response at ¶¶ 73–77.) Therefore, Morrison could not have agreed to a substitution of the new obligations because he was not aware of them. Furthermore, Ruso never agreed to discharge the obligations owed to him under the contracts at issue here. (Pl. Rule 56.1 at ¶ 81.): *see Northville Indus. Corp. v. Fort Neck Oil Terminals Corp.*, 100 A.D.2d 865, 867, 474 N.Y.S.2d 122 (N.Y.App. Div. 2d Dep't 1984), *aff'd* 100 A.D.2d 865, 474 N.Y.S.2d 122 (1984). Therefore, the requirement that all parties agree to the new obligations was not met and there was no novation.

CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment is granted as to the negligence and misappropriation causes of action. The breach of fiduciary duty claim based on defendant's failure to protect plaintiff's investment is dismissed. The claims for breach of the Escrow Agreement and the PRC are also dismissed. The motion for summary judgment is denied with respect to the following: (1) the fraud claim; (2) the claim for breach of fiduciary duty based on Morrison's representations to the plaintiff regarding the investment structure and risk level; and (3) the claims for breach

contract relating to the Joint Participation Agreement and the Power of Attorney.

SO ORDERED.